IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEVEN LYNN CRUM, | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. 10-180 |
| | ) | |
| v. | ) | Judge Sean McLaughlin |
| | ) | Magistrate Judge Susan Baxter |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant | ) | |

# MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

## I. RECOMMENDATION

It is respectfully recommended that the Court grant Plaintiff's Motion for Summary Judgment, in part, and deny, in part, deny Defendant's Motion for Summary Judgment, and vacate the decision of the administrative law judge ("ALJ") to remand for reconsideration.

## II. REPORT

**A. BACKGROUND**

Steven Lynn Crum ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433 ("Act"). This matter comes before the Court on cross motions for summary judgment. (ECF Nos. 11, 14).

1. <u>General Background</u>

Plaintiff filed for DIB on February 15, 2007, claiming a disability onset date of December 14, 2004. (R. at 77 – 79)[1]. Plaintiff was born on April 22, 1968, and was forty years of age at the time of his administrative hearing. (R. at 24). Plaintiff completed his high school education but had no post-secondary education. (R. at 24). Plaintiff last worked for a local electric company cutting tree limbs. (R. at 144). Plaintiff was married and resided with his wife and children. (R. at 115 – 24).

2. <u>Adult Function Report</u>

In March of 2007, Plaintiff completed an Adult Function Report outlining his daily activities and physical limitations. (R. at 115 – 24). Plaintiff described a daily routine beginning with use of a transcutaneous electrical nerve stimulation ("TENS") unit for back pain and knee high socks to prevent swelling in his legs. (R. at 115 – 24). He then would eat breakfast and read or watch television until at least 10:00 a.m. (R. at 115 – 24). If he attempted any activity prior to that time, he would experience severe pain and swelling in his legs that would persist for up to several days. (R. at 115 – 24). As a result, he tended to keep his legs elevated most mornings. (R. at 115 – 24). Any activity involving standing caused Plaintiff's legs to swell. (R. at 115 – 24). At night, Plaintiff often woke up with leg and back cramps, and arm numbness. (R. at 115 – 24). He described his leg pain as sharp. (R. at 115 – 24). Postural movements, temperature changes, and lifting could affect his back pain. (R. at 115 – 24). The pain was relatively constant. (R. at 115 – 24). Medication only dulled the pain, and had unpleasant side effects such as upset stomach and irritability. (R. at 115 – 24). In addition to his TENS unit, Plaintiff claimed he used a back brace. (R. at 115 – 24).

---

[1] Citations to ECF Nos. 5 – 5-2, the Record, *hereinafter*, "R. at __."

At home during the day, Plaintiff would help care for his children, care for the pets, could grill and prepare simple meals every day, make small household repairs, sweep the floors, change his oil, clean up the yard, and fill his wood stove. (R. at 115 – 24). Plaintiff claimed that his wife often helped him, however. (R. at 115 – 124). Plaintiff could make short trips out of the house on his own, and could go shopping every other week. (R. at 115 – 24). He would spend forty five minutes a day doing exercises for his back. (R. at 115 – 24).

In his free time, Plaintiff watched television and movies, read, played guitar one to two hours at a time, and went hunting two to four hours at a time. (R. at 115 – 24). He regularly attended church, bible study, and doctors' appointments. (R. at 115 – 24). However, Plaintiff explained that he was unable to engage in social activities because he tired easily. (R. at 115 – 24). Plaintiff could only walk for approximately one hundred yards before requiring ten to twenty minutes rest. (R. at 115 – 24). Plaintiff could not maintain concentration for more than ten minutes. (R. at 115 – 24). He often had to re-read things several times, and could not keep track of more than one to two spoken instructions at a time. (R. at 115 – 24). Plaintiff did not handle stress or change well, often becoming angry. (R. at 115 – 24).

3. Treatment History

Plaintiff's physical difficulties began just prior to March 19, 2004, when he underwent left shoulder arthroscopic rotator cuff repair and acromioplasty for a rotator cuff tear and impingement syndrome. (R. at 179). Plaintiff's orthopedic physician, Nick Stefanovski, M.D. performed the procedure. By May of 2004 Plaintiff's shoulder was doing well, his range of motion was improved, his strength was returning, and he was capable of returning to light duty work. (R. at 179). Plaintiff still experienced some discomfort in the shoulder, however. (R. at 179). In July of 2004, Plaintiff's left shoulder was still doing well, his strength was good, and he

had almost a full range of motion. (R. at 184). Following a positive checkup in August of 2004, Plaintiff would only be required to return for his shoulder on an as-needed basis. (R. at 184). He had returned to work by that time. (R. at 184).

His physical difficulties continued in December of 2004 after he fell approximately thirty feet while cutting tree limbs on the job. (R. at 142, 144, 147). He fell into a snow embankment and sustained severe bilateral tibial plateau fractures; as a result he underwent orthopedic surgical fixation to stabilize his knee injuries on December 15. (R. at 142, 144 – 45, 147 – 48, 151 – 54, 180). Dr. Stefanovski also performed this procedure, implanting bone grafts, plates, and screws. (R. at 153, 171, 180). The surgery was successful and Plaintiff was discharged from the hospital on December 20. (R. at 142). He was noted to be doing very well following surgery. (R. at 115 – 124, 181). A bilateral lower extremity venous doppler on December 27 showed no signs of deep venous thrombosis. (R. at 164).

The result was the same in January of 2005. (R. at 166). Additionally, Dr. Stefanovski noted that his range of motion was good, he was only lacking five to ten degrees of full knee extension, his flexion was good, and his x-rays showed excellent alignment at the injury site. (R. at 181). Dr. Stefanovski was optimistic that Plaintiff would be doing some weight bearing in four more weeks. (R. at 181). In March and April of 2005, Plaintiff's injury was healing well, his range of motion was good, and he was ambulating well for short periods of time. (R. at 182). There was some swelling in his calves because of a herniation of the tib muscle. (R. at 182). Dr. Stefanovski prescribed special stockings to provide support. (R. at 182).

Plaintiff complained of discomfort and some numbness from his left shoulder to his elbow in August of 2005. (R. at 182). Yet, Dr. Stefanovski noted Plaintiff had a full range of motion and good strength in the shoulder. (R. at 182). Dr. Stefanovski recommended continued

4

observation of the shoulder. (R. at 182). Plaintiff also had renewed complaints of discomfort in his knees, particularly the left knee, in August. (R. at 171). He ambulated well, however, and imaging of his knees showed that the fractures were healing. (R. at 171). There was no tenderness in the lower extremities, Plaintiff's right knee exhibited full extension, and his left knee was just three degrees short of full extension. (R. at 172). There was no swelling, redness, or increased warmth. (R. at 172). The lower extremities were neurovascularly intact. (R. at 172). Still, Plaintiff underwent elective left knee arthroscopy, and had the fixation hardware removed from both of his knees by Dr. Stefanovski on October 10, 2005, to try and treat the continued discomfort. (R. at 167, 171, 183).

Steve was noted as doing well following his second knee surgery. (R. at 185). Dr. Stefanovski wanted him to remain off of work until at least February of 2006. (R. at 185). Plaintiff complained of continued pain and some swelling of his legs. (R. at 185). However, x-rays showed nothing unusual, Plaintiff had a good range of motion, there was no effusion, and there was no instability. (R. at 185). On February 23, 2006, Plaintiff was released for light to sedentary work. (R. at 185). He could not walk or stand for more than two hours at a time; however, he was not to sit all of the time because of swelling that could develop. (R. at 185). Despite continued complaints in the following months of pain in his legs and knees, Dr. Stefanovski consistently indicated that Plaintiff was doing fairly well, that his range of motion was good, his injury was healing, and there was no evidence of effusion in his knees. (R. at 186, 285 – 6). He recommended Plaintiff seek vocational rehabilitation to pursue a new line of work. (R. at 186).

In November of 2006, Plaintiff returned to Dr. Stefanovski complaining of lower back pain. (R. at 186). X-rays showed slight scoliosis, slight narrowing of the T12 vertebra, and

5

slight anterior listhesis at the L3 and L4 level of the spine. (R. at 186). Magnetic resonance imaging ("MRI") showed spondylolisthesis at the L3 – L4 level of the spine and a small left subarticular disc protrusion at the L5 – S1 level of the spine. (R. at 294). Dr. Stefanovski referred Plaintiff to a neurosurgeon, and eventually for pain management. (R. at 285).

In October of 2007, Plaintiff continued to complain of right shoulder and left knee pain. (R. at 284). Dr. Stefanovski provided injections at both sites for pain relief. (R. at 284). He also suspected degeneration of Plaintiff's left knee. (R. at 284). In the spring of 2008, Dr. Stefanovski noted further complaints of right shoulder and left knee pain. (R. at 283). He recommended considering a shoulder scope. (R. at 283). He also provided three additional injections for Plaintiff's knee pain. (R. at 282 – 83). In July of 2008, Dr. Stefanovski performed a right shoulder arthroscopy and rotator cuff repair. (R. at 292).

Following Plaintiff's shoulder surgery, he was observed to be doing well. (R. at 282). Plaintiff's knee pain was also addressed with the additional injections; Dr. Stefanovski noted Plaintiff indicated his knee was improving, there was no grinding in the joint, there was no swelling, and there was no pain throughout his range of motion. (R. at 282).

Plaintiff had seen Ron Bonfiglio, M.D. per the recommendation of Dr. Stefanovski for his back pain. (R. at 197). Dr. Bonfiglio recommended that Plaintiff attempt four to eight weeks of physical therapy. (R. at 197). He was also prescribed medication for pain relief. (R. at 197). Plaintiff reported good pain relief from the medication at a follow up session, and noted that despite continued back pain, there was improvement. (R. at 199). Dr. Bonfiglio advised that Plaintiff simply continue with therapy and prescription pain medication. (R. at 199). Plaintiff also received epidural injections for the pain in his lower back. (R. at 254, 280).

The record shows that Plaintiff was seen by Jonathan Costa, M.D., Ph.D. for pain management for a period of time spanning July of 2007 to September of 2008. (R. at 224 – 39, 296 – 311). Dr. Costa's primary goal was management of Plaintiff's pain through medication. (R. at 224 – 39, 296 – 311). During the course of his treatment, Dr. Costa noted mixed results with relief of pain through medication, although Plaintiff's pain tended to improve over time. (R. at 224 – 39, 296 – 311). Gait was typically mildly antalgic, but improved with physical therapy. (R. at 224 – 39, 296 – 311). Dr. Costa did note Plaintiff's complaints of chronic pain, but as time progressed, Plaintiff's pain was more manageable. (R. at 224 – 39, 296 – 311). A functional capacity evaluation ordered by Dr. Costa in November of 2007 cleared Plaintiff for sedentary work. (R. at 224 – 39, 296 – 311). Plaintiff's mood and sleep patterns were often variable as a result of medication, yet tended to improve over time. (R. at 224 – 39, 296 – 311). Injections for pain provided mixed results. (R. at 224 – 39, 296 – 311).

4. <u>Administrative Hearing</u>

At his hearing, Plaintiff testified that he had trouble standing for any period of time due to his leg pain and swelling. (R. at 24). His left knee often gave out, and he had difficulty walking distances. (R. at 24 – 25). Uneven ground and changes in temperature made the pain worse. (R. at 25). Plaintiff's lower back pain, neck pain, left wrist pain, and medication side effects presented additional functional limitations that allegedly prevented Plaintiff from working full time. (R. at 25).

Plaintiff explained that he took a significant quantity of prescription medication every day, including methadone and fentanyl for pain, Celexa for depression, and Ambien for trouble with sleep. (R. at 26 – 27). As a result, Plaintiff claimed that he was often moody and irritable, and sometimes experienced dizziness, headaches, confusion, difficulty sustaining concentration

and attention, chills and sweats, blurred vision, unsteadiness, drumming in the ears, lightheadedness, constipation, and drowsiness. (R. at 27 – 28). Plaintiff would fall asleep around ten or eleven in the evening, but would have difficulty waking before ten in the morning – often not waking until noon. (R. at 28).

After taking his medications in the morning and taking a hot shower or bath to loosen up, it would take until about three in the afternoon to become able enough to do things around the house. (R. at 29). Plaintiff would do chores to help his wife, but claimed to require assistance from his wife and children. (R. at 29 – 30). While Plaintiff spent a significant amount of time reading every day, he often experienced difficulty focusing on what he was reading, and would have trouble understanding the material being read. (R. at 30 – 31). Plaintiff was not able to maintain any regular schedule. (R. at 30, 32).

## B. ANALYSIS

### 1. Standard of Review

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[2]

---

[2] Section 405(g) provides in pertinent part:
> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

and 1383(c)(3)[3]. Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based, and the court will review the record as a whole. *See* 5 U.S.C. § 706. When reviewing a decision, the district court's role is limited to determining whether substantial evidence exists in the record to support an ALJ's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). In short, a court can only test the adequacy of an ALJ's decision based upon the rationale provided by the ALJ. A court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable

---

[3] Section 1383(c)(3) provides in pertinent part:
    The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

9

regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986).

2. <u>Discussion</u>

The ALJ determined that Plaintiff suffered severe medically determinable impairments in the way of status post bilateral tibial fractures and degenerative disc disease. (R. at 16). However, Plaintiff was determined not to be disabled because he had the residual functional capacity to perform the full range of sedentary work. (R. at 17). Based upon the Medical-Vocational Guidelines Rules 201.28 and 201.29, 20 C.F.R. Part 404, Subpt. P, Appx. 2, a significant number of jobs existed in the national economy which Plaintiff could perform. (R. at 20).

Plaintiff objected to this determination, claiming that the ALJ did not address Plaintiff's ongoing problems with leg pain and swelling, and right shoulder pain, as documented by Dr. Stefanovski; he did not explicitly address the findings of Dr. Costa; and, he failed to consider non-exertional limitations resulting from Plaintiff's heavy use of prescription medication. (ECF No. 12 at 2 – 9). Defendant counters that Dr. Stefanovski's medical notes did not indicate a level of functional limitation which prevented Plaintiff from engaging in substantial gainful activity, that the ALJ implicitly considered Dr. Costa's findings, and that based upon the objective medical evidence and Plaintiff's accounts of his daily activities, Plaintiff's alleged non-exertional limitations were not credible. (ECF No. 15 at 12 – 19).

When rendering a decision, an ALJ must generally provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the ultimate disability finding. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). *See also Fargnoli v. Massanari*, 247

F.3d 34, 42 (3d Cir. 2001); *Morales v. Apfel*, 255 F.3d 310, 317 (3d Cir. 2000); *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993). The ALJ need only discuss the most pertinent, relevant evidence bearing upon a claimant's disability status, but must provide sufficient discussion to allow the court to determine whether any rejection of potentially pertinent, relevant evidence was proper. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 – 04 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000); *Cotter*, 642 F.2d at 706). In the present case, the ALJ failed to adequately meet his responsibilities under the law. Key pieces of evidence in a relatively concise medical record were not properly addressed by the ALJ.

With respect to Plaintiff's shoulder complaints, however, the ALJ's analysis was not flawed. The Act requires that a disabling impairment have existed, or be expected to exist, for a continuous period of at least twelve months. The record clearly shows that Plaintiff's complaints regarding his shoulder pain were sporadic in nature, and that following surgical interventions for pain on both the right and left shoulders, Plaintiff saw significant improvement in his symptoms. As a result, the ALJ's decision was – in this respect – supported by substantial evidence.

Substantial evidence also supported the ALJ's analysis of the impact of Plaintiff's lower back pain. The medical record showed only conservative treatment through therapy and medication management by Dr. Bonfiglio. Medical imaging of Plaintiff's lower back showed only slight degenerative changes. Though Plaintiff claimed he was told he could be a candidate for surgical intervention, none was actually recommended by any treating physician on the record. As such, the ALJ's analysis of the limitations created by Plaintiff's back pain was adequate.

On the other hand, discussion of Plaintiff's leg and knee pain, and the side effects of pain medication for treatment, was lacking. Following the first surgery subsequent to Plaintiff's severe injury in December of 2004, Plaintiff was not released for work by Dr. Stefanovski until February of 2006 – following his second knee surgery. Plaintiff spent a significant number of months in a period spanning over a year without the ability to bear weight. These factors were not mentioned by the ALJ in his analysis.

Further, none of Dr. Costa's lengthy findings – spanning over a year – were discussed in any way, whatsoever. Many of Dr. Costa's medical notes corroborate Plaintiff's complaints of pain and non-exertional limitation. It is not the province of this court to go back and re-weigh the evidence of record and make findings of fact; that is the province of the ALJ. However, "[c]ourts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review." *Cotter*, 642 F.2d at 705 n. 7 (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). An ALJ cannot reject probative evidence for "no reason or for the wrong reason." *Morales v. Apfel*, 255 F.3d 310, 317 (3d Cir. 2000) (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)). Therefore, an ALJ's decision should allow a reviewing court the ability to determine if "significant probative evidence was not credited or simply ignored." *Fargnoli*, 247 F.3d at 42.

"The ALJ must 'do more than simply state ultimate factual conclusions . . . the ALJ must include subsidiary findings to support the ultimate findings' and must provide 'not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected. In the absence of such an indication, the reviewing court cannot tell if significantly probative evidence was not credited or simply ignored.'" *Brophy v. Halter*, 153 F.Supp.2d 667, 673 (E.D.Pa. 2001) (quoting *Stewart v. Secretary of H.E.W.*, 714 F.2d 287,

290 (3d Cir. 1983). *See also Ginther v. Comm'r of Soc. Sec.*, 2010 WL 2253748 at *8 (W.D.Pa. 2010). This discussion need not be exhaustive, but should "be accompanied by a clear and satisfactory explication of the basis on which it rests." *Fargnoli*, 247 F.3d at 41; *Cotter*, 642 F.2d at 704-05. In this case, particularly with regard to Plaintiff's subjective complaints of functional limitation and Dr. Costa's notes, there was not adequate discussion by the ALJ.

C.  CONCLUSION

Based upon the foregoing, the ALJ did not provide sufficient justification from the medical record and Plaintiff's personal testimony to allow this Court to conclude that substantial evidence supported his decision. Accordingly, it is respectfully recommended that Plaintiff's Motion for Summary Judgment be granted to the extent he seeks review of the ALJ's determination, and denied to the extent he seeks a reversal. Defendant's Motion for Summary Judgment should be denied. The decision of the ALJ should be vacated and the case remanded for further consideration not inconsistent with this Report and Recommendation.

"On remand, the ALJ shall fully develop the record and explain [his or her] findings… to ensure that the parties have an opportunity to be heard on the remanded issues and prevent *post hoc* rationalization" by the ALJ. *Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798, 800 – 01 (3d Cir. 2010). *See also Ambrosini v. Astrue*, 727 F.Supp.2d 414, 432 (W.D.Pa. 2010). Testimony need not be taken, but the parties should be permitted input via submissions to the ALJ. *Id.* at 801 n 2.

Pursuant to the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Civil Rules, the parties are allowed to file objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation.

Failure to do so will waive the right to appeal. <u>Brightwell v. Lehman</u>, 637 F.3d 187, 193 n.7 (3d Cir. 2011).

June 29, 2011

<u>*s/ Susan Paradise Baxter*</u>
Susan Paradise Baxter
United States Magistrate Judge

cc/ecf: All counsel of record.